WAG Acquisition, LLC v. Walt Disney, Hulu, Netflix, Google, Amazon, etc., 2024, 16, 27, 28, 31, 32, 33, and 34. Mr. Abramson, we're ready when you are. May it please the Court. The appealed IPRs all concern the same patents and the same principal reference, Carmel. I will address three things. First, Mr. Abramson, multiple sections of your opening brief focus extensively on the testimony of Amazon's expert, Dr. Jaffe. But Dr. Jaffe's testimony is not part of the record in the Disney IPRs. I'm sorry, not part of the record in what? In the Disney IPRs. That's correct, Your Honor. What in the record or the law authorizes your use of that testimony? Well, the three cases are being briefed together. We, our expert, testified to the same substance that Dr. Jaffe testified to. But, no, Dr. Jaffe, his testimony was not introduced in the IPRs occurred in sequence. And all of the events on Jaffe occurred after we had done the briefing on the Disney case. It's not in that record. You're correct. And what in the law then authorizes you to use it? We're briefing all three cases. I suppose your references to Dr. Jaffe's testimony are directed to the Amazon IPR appeals, right? The Amazon IPR and the Disney, it is in the record. It's still relevant to your Disney IPR appeal? Absolutely. It's in the record. Which record? And we argued it. The Disney record? It's in the, not the Disney record, it's in the Google record. Right. In the Disney record. So for your Disney IPR appeal, you're constrained to the record in that Disney IPR appeal? Yes. And in the record, we have the testimony of our expert, Mr. Horty, to the same effect as Jaffe. So you didn't cite to him, you cited to Jeff or Jaffe? Sorry? Is it Jaffe? Jaffe. You cited to Jaffe. Well, Jaffe is not in the record. I agree with you. It's not in the record in the Disney IPR. Okay. So we can cut out everything from your brief where you cited to Jaffe. Well, we were instructed to present one brief on all of these cases. But we can cut out everything from your brief relating to Disney where you cited Jaffe. Is that correct? Yes, you can.  In your opening brief, you hint at an APA challenge by arguing that the inconsistencies among the final written decisions under appeal reflect arbitrary and capricious agency action. But then there's nothing else. Are you raising an APA challenge? I think you could take it that way, Your Honor. If I take it that way, what authority or points do you make? The point is that we have three cases all involving the same panel, the same patents. Points and authorities are a thing. Right. Understood. Understood. But let me, addressing this, if you want to look at these, cabin them off, look at these three cases, looking at the Disney case, right, there is no, not a question of substantial evidence, there is no record, there's no evidence in the record of any HTTP GET requests for elements. And that's true whether you base that on Horty's testimony or on a combination of Horty's testimony and Jaffe's testimony. In your special purpose hardware argument section, you make a single citation to a final written decision in the Disney IPRs before raising Carmel's figure eight. I don't. That's in the blue brief at 47 to 49. Was Carmel's figure eight ever raised in the Disney IPRs? And if so, where is it in the record? I'm sorry, Your Honor. The brief that you're referring to is our opening brief? Yes. All right. Blue brief 4749 to 49 through 49. Well, why don't you come back and move on to the merits? Pardon me? Please move on to the merits. You can come back on rebuttal with that answer. Yes, it's very challenging. Let's start with the Disney IPR, okay? Let's start with Disney. Let's assume for the moment after reviewing the board's decision, I'm inclined to think there is substantial evidence to support their fact finding that Carmel teaches limitation 1K. And then there's multiple different theories the board relied on. One is the so-called alternating links theory. Downloading alternating links requires separate requests for each link. Then there's the continuous loop theory. When you look at the loop, you're going to be selecting individual slices as you keep going through the loop. And then finally and separately, there's the HTTP get request theory. So there's three mountains you have to climb. Why is there not substantial evidence that would just end the appeal? Well, to begin with, there's no evidence, let alone substantial evidence, of any HTTP get requests in this entire patent. It's not mentioned from beginning to end. Is there evidence in expert testimony? There is not. So do you dispute that when you use HTTP, there's something called an HTTP get request? Absolutely there is an HTTP get request. But the limitation was receiving requests for a stream of data. And if you look at Dr. Howe, who is their expert, he took that at face value. And he said that looking at figure 6A of Carmel, he didn't point to anything that actually said, here's a request, here's another request, here's another request to get this data. He did not point to that. He said it was necessarily the case because HTTP has to work that way. It was an inherency theory. If you look at paragraph 128 of his declaration, it was totally an inherency theory on Disney's point as to that limitation. What about the other two theories? Which other two theories? The loop theory and the alternating links theory. Again, he did not – if you look at his declaration, he only said this necessarily implicates figure 6A, which he pointed to. That's the loop, right? He said it has to be HTTP gets, okay? He said that. That was the basis of his opinion. When we took his deposition, he couldn't say that he had actually looked at the governing version of the HTTP standard, which was HTTP 1.1. He came in there and was testifying as to old HTTP 1. What we have here is that this is a very fact-intensive case, and you've already been in front of the fact-finding tribunal that made a call. And it's difficult for us as an appellate court to proclaim that what the board found was unreasonable in light of all the competing evidence in the record. I'm well aware of that, Judge Chen, and I've had this discussion before. In fact, with your honor.  In writing these briefs, I was completely aware of that. But substantial evidence requires evidence. There's no evidence here. There's no evidence of an HTTP request. The only evidence is an expert saying it has to be this way, right? And the only evidence on the record that addresses that is our expert that says it doesn't have to be this way because there's another way of doing it, and nobody contradicted that. There's another way of streaming with HTTP under the 1.1 standard that's cited in Carmel. If there is another way to do it, it can't be inherent that the way that Dr. Howe said it is the only way to do it. How do you deal with all the board's findings of waiver below in the Disney IPR? Pardon me? How do you deal with all the findings of waiver? And there are a lot of them. I'm not sure which findings you're referring to. You've read the IPR. Yes, indeed, your honor. The board repeatedly says you waived arguments. Well, you'd have to help me with which arguments you're referring to. Is it fair to say that your Disney IPR appeal is just about limitation 1K? It was a little hard to parse. You're just talking about the Disney appeal? Yeah, it's not about claim construction. It's just limitation 1K and whether substantial evidence supports the board's fact-finding that Carmel discloses limitation 1K. Is that the sum and substance of the Disney appeal? It's certainly central to the Disney appeal. Is there something else? Because right now, that's the only thing I understand your Disney appeal to be about. Yeah, I think, you know, I was – About the Amazon appeal. The Amazon appeal – Is it also about just whether substantial evidence supports the board's fact-finding that Carmel discloses limitation 1K? Is there something else? Oh, yes. There's something else, which is the argument that they raise – the argument that they raise on appeal, which is just the argument that streaming a video, for instance, would have been obvious over the ability to get an individual image by HTTP 1.0, which the board and Disney actually raised – What limitation is that in regards to? Pardon me? This argument that you're saying that's part of your Amazon appeal, which claim limitation is that in regards to? The request limitations. Limitation 1K? It's not 1K, actually. It's 1J and 1K. It's both 1J and 1K. And it's that the patent requires individual requests for successive elements, right? That 1J says that the server cannot maintain state, which the claim is trying to narrow in on a pure pull. About making the repeated request. Making repeated request. 1J says it can't maintain state, and 1K says it can't send anything unless it was specifically requested. Counsel, you're into your rebuttal time. You can save it or use it. I will reserve the rest of my time. All right. Mr. Haddon. Thank you. Good morning, Your Honors. May it please the Court. Stanley Panikowski arguing on behalf of Appellees Disney. All right. Apologies. No worries, Your Honor. I'm arguing on behalf of Appellees Disney, Hulu, and Netflix. And Mr. Haddon will argue on behalf of the Amazon Appellees. And I understand, Your Honors, that I am responsible for monitoring the allocation of our time. Your Honors, substantial evidence supports the Board's final written decisions in the Disney IPRs. As counsel acknowledged and as the briefing shows, the issues on appeal relate only to Limitation 1K. And for Limitation 1K, the Board relied on four principal sources of evidence. Individually and together, these sources provide more than substantial evidence to support the Board's decision under multiple independent obviousness theories that Disney's expert, Dr. Ho, articulated. First, Your Honors, the Board relied on Carmel's disclosures themselves. And in particular, the separate files embodiment that is reflected in figures 3A and 6A at pages 9339 and 9343 of the record and the text accompanying those figures in the specification. Especially column 10 lines 24 to 63 at page 9352 of the appendix, which describes the operation of the flow chart in figure 6A, as well as appendix page 9348, column 2 lines 22 to 23, which explains that in Carmel, preferably, each slice is contained in its own separate respective file. And Dr. Ho relied on that disclosure in his testimony about HTTP GET request, which begins at page 6910 of the joint appendix in his initial declaration, carries through his reply declaration at pages 131 to 35, and also in his deposition testimony at pages 10420 to 40 of the joint appendix. And in that testimony, Your Honors, Dr. Ho explained how a skilled artisan would understand Carmel's disclosures in light of the preference to put each slice into its own separate respective file in light of the HTTP standard, which both parties experts agreed involves GET requests. In figure 6A, that is the clue that tells us that it's necessarily a pull system and not a push system. Why couldn't what's happening in that loop be illustrating a push system? Your Honor, what's happening in that loop would not describe what either party's experts would characterize as a push system for several reasons. First, you have the read index file step happening after the HTTP from server step. And as column 10 at pages 9352 explain, the reason why the client will read the index file is in order to determine what is the most recent slice that has been uploaded by the transmitting computer 34 to the server 36. And then the next clue, Your Honor, is after reading the index file, the client will select the appropriate starting slice. And in 6A, it's even more general. It simply says select slice. And there would be no reason for the client to be selecting a slice if everything had already been sent from the server on the server's own initiative. And then finally, Your Honor, on the same page 9352, column 10, at lines 45 to 48, Carmel explains that after selecting an appropriate starting slice, the client, quote, begins to download and decode, parentheses, decompress files 42, 44, 46, et cetera. And so there would be no reason for the client to be downloading those files if, as WAG contends, they had already been sent from the server in an earlier step in that process. And the board, Your Honor, relied on all of that evidence, which is in Dr. Ho's testimony, to support one of multiple independent theories, why there is obviousness here. And even under what the board called the express teaching of Carmel rubric, the reliance on the figure 6A flowchart was only one of multiple theories. There's also the successive alternation theory. Is figure 6B a push system or a pull system? Your Honor, under the definition that Disney's expert Dr. Ho gave of a pull system versus a push system, and that's at page 6841 of the joint appendix, figure 6B would represent a pull system because that is where the client is still initiating the request. In 6B, the client is making multiple requests for new slices during the playback? Your Honor, that was Dr. Ho's opinion, which was expressed at figure 6B at page 6809. However, Your Honors, figure 6B is not relevant to this appeal. The board actually took a somewhat different view of figure 6B than Disney's expert did, but the board specifically said at appendix page 221 that Disney is not relying on figure 6B, what the board called the single file embodiment, in support of its inherent disclosure theory or what the board called what an ordinarily skilled artisan would understand based on Carmel's disclosures. And then in the express teaching section of the board's final written decision at appendix pages 211 to 215, the board itself did not rely on figure 6B at all. And therefore, figure 6B is irrelevant to the board's decision and irrelevant to the appeal, and any differences among different parties' views or the board's view of figure 6B are irrelevant to the fact that substantial evidence supports the board's decision. Your Honors, the other pieces of substantial evidence that support the board's decision under these multiple theories include the declarations and deposition testimony of Disney's expert Dr. Ho, which we've discussed with respect to some theories, and in particular with the successive alternation theory that was discussed at length, not only in the declarations of Dr. Ho, but also in his deposition testimony. And the board specifically relied on that deposition testimony at appendix pages 214 to 215 to credit Dr. Ho's theory that when you look at Carmel's disclosures of successive alternation in light of the HTTP standard, a person of ordinary skill in the art would understand that what Carmel is teaching is that the client sends a request over one link, and then the server sends one file in response to that request over that link. And then the second link that the client has opened, the server will only send a file over that link in response to a request by the client after the client has opened that particular link. There are also admissions in the declarations and deposition testimony of WAG's expert, Mr. Horty, particularly at appendix pages 9981 to 82, where he admits that servers do not send data that they are not specifically requested to send. And because that's the only element that limitation 1K adds over limitation 1F, where WAG did not contest at the board level that Carmel discloses limitation 1F, that admission alone would be dispositive on limitation 1K in addition to all these other independent grounds. And unless there are further questions, Your Honors, we ask that you affirm the board's final written decisions in the Disney IPRs, and I will now yield to Mr. Haddon. Thank you, Mr. Panikowski. Thank you. Mr. Haddon. May it please the Court. The two issues in the Amazon appeal both relate to the substantial evidence standard. The first one is the one that we have been discussing, whether Carmel's separate file embodiment would teach a person of ordinary skill in the art that there would be separate requests for each file. There's really no dispute about this. All three experts agree that the way HTTP works, it's a request-response protocol, and you're not going to receive a file that is not requested. Dr. Ho opined on this, Dr. Jaffe, and Mr. Hordy, WAG's expert as well. Is it undisputed that Figure 6A is a separate file embodiment? Figure 6A is explicitly described in the specification as relating to the separate file embodiment, yes, Your Honor. The notion that WAG's counsel talked about, that somehow this changes in HTTP 1.1, is not accurate. So 1.1 has this chunk transfer coding, which allows a large file to be returned from the server in separate pieces. But all of the experts, again, Mr. Hordy included, agree that you are still only going to get the file you requested. So, in fact, in Carmel, the 1.1 chunk transfer encoding is only referenced with respect to the single file embodiment. We have a large file that can be sent back in multiple chunks. The separate file embodiment doesn't reference 1.1 at all, and all of the experts agree that it would have to operate by receiving separate requests. The only other argument that WAG makes is the data producing process suggestion, that instead of having a file at the server, you could have some script that would generate data on the fly. But that's not at all what Carmel describes. Carmel describes that these slices are stored as separate static files that are returned to the client. So there's really no dispute, and there's more than substantial evidence to support the board's finding that the separate file embodiment in Carmel would teach one of ordinary skill in the art, element 1K, of requesting separate files. The other issue that's unique to the Amazon appeal is the combination with the FIG reference. And the only dispute, there's no dispute from WAG that FIG in conjunction with Carmel discloses all the claim limitations or renders them obvious. The only dispute is whether there was sufficient evidence or substantial evidence of a motivation to combine. And there clearly is. Both FIG and Carmel are describing a system in which sequential segments of video are stored as separate files on the server and are provided to the client over HTTP. Now, admittedly- Is the reliance on FIG for limitation 1K or for something else? It's for 1K in addition, Your Honor. In addition to what? To Carmel. Okay, in addition to Carmel. Yeah. But you didn't rely on FIG for other limitations beyond limitation 1K? We confirm that FIG included, along with Carmel, other elements like 1F. But again, the only issue here today is 1K, and specifically as an alternative to Carmel alone- And just for my understanding of the Board's decision, was the motivation to combine Carmel and FIG premised on both of the references being pull systems? It is. And then if so, then you have to still establish that Carmel is, in fact, a pull system. I agree, Your Honor. I would phrase it slightly differently, but I think that's the point. Given that there is substantial evidence supporting that Carmel requires separate requests for files, there has been no reason that you would not combine it with FIG, if that makes sense, Your Honor. And the further reason or motivation to make that combination is because FIG provides the specific details about how to implement those separate requests that are admittedly lacking in Carmel. Carmel describes it at a higher level. But FIG specifically includes this sequence of URLs that can be grouped into segments and that are automatically requested by the client when the buffer needs more data to stream. And it will alternate buffers so that it will receive on one buffer, play out from buffer. All of those are useful details for implementing the separate file embodiment in Carmel. Was your theory for Carmel that Carmel teaches making these repeated requests based just on the fact that Carmel discloses HTTP? And people, skilled artisans would know HTTP, have HTTP get requests? It's two things. It's HTTP plus the separate files. Yeah. So I think those together, a person of ordinary skill would know that you need to request those files separately in HTTP, whether it's HTTP 1.0 or 1.1. If there are no further questions, I will sit down. Thank you, counsel. Thank you. Mr. Abramson has some rebuttal time. Yes. Yeah, I want to address one thing that Mr. Panikowsky said. Mr. Abramson, before you do, let me clarify something for you. When I said waiver, what I meant was repeatedly the board says patent owner makes no arguments specific to limitation 1B, 1C, 1D, and so on. Oh. You agree that that's effectively waiver? That's what the question was. I definitely agree. Clear on that. Not disputing that. Mr. Panikowsky was referencing difference between figures 6A and 6B. And Disney doesn't want us to talk about 6B. But, you know, if you look at their petition, the petition sets out 6A and 6B as just different embodiments representing the same pull, pure pull process. That was the premise of the petition. How do you deal with the board stating, specifically stating petitioner does not rely on the 3D, 6B single file embodiment when asserting that Carmel inherently teaches 1K? It backed away from it during argument. But the petition came in, you know, full bore on 6B as well as 6A, making no distinction. Dr. Howe, you know, didn't make a distinction in his declaration. How do we deal with that specific finding? Well, it's because it's pretty clear now that nobody wants to come in and tell this court that 6B represents a pull. Amazon certainly doesn't. Amazon dropped both 6A and 6B. There's a statement in their brief where they're not relying on that. But why would there be a difference between 6A and 6B? Carmel doesn't suggest anywhere that there's a difference. There's a whole patent written on this thing, and they give two embodiments. One is they put the encoded, they put the encoding in one file. They put one encoding, a single level of encoding. Did your expert try to make this distinction between 6A and 6B? My expert said that neither one of them, said they were both. My expert said they were both pushes, right? Carmel doesn't make any distinction between the two. It's just a question of whether you put the encodings in one file or not. They interleave them. They multiplex them in the 6B embodiment. And Dr. Howe's, you know, opening declaration treated that the same as 6A. This whole thing is morphed. And there's something about it where, you know, an expert comes in and makes conclusory statements without pointing to specific requests and says that this figure stands for multiple requests. And if you look at figure 6A. Well, as you can see, your time has expired. Thank you, Your Honor. Thank you. The case is submitted.